BARRY, Judge.
Both parties in this domestic dispute question a myriad of factual determinations in a community property partition and the wife appeals the denial of increased child support.
James T. Wall, III (James) and Maureen O’Brien Wall (Maureen) were married in June, 1968 and had two children, now age 7 and 10. Maureen secured a separation based on abandonment on June 29,1978 and by joint stipulation she got custody of the children and child support and visitation were set. On September 1, 1978 James filed to partition the community, Maureen answered, then reconvened on December 18, 1978. The next day the parties entered a consent judgment on the record which divided all of the community immovables and most of the other community property. Immediately following the consent judgment they executed an “Act of Partition & Community Settlement” which incorporated the provisions of the oral consent judgment.
On June 4, 1980 James filed a Petition to Enforce or Annul Community Property Settlement in which he alleged there were items to which he was entitled pursuant to the partition agreement which he had not received. He also specified community obligations which were paid from his separate estate, as well as debts which were owed by the community. Maureen reconvened for delivery of items allegedly due under the property settlement, for reimbursement of *535 income allegedly received by James, for reimbursement of interest and penalties assessed by the Internal Revenue Service, and for attorney’s fees.
A divorce judgment was rendered on October 23, 1980 which continued Maureen’s custody of the children and the existing child support of $400 per month per child. A judgment on April 16, 1981 allocated certain community property between the ex-spouses and determined various debts were to be paid by the community, or by James or Maureen individually. The judgment did not address several claims, both spouses applied for a new trial which was denied, and they now appeal.
James filed several rules to reduce the child support and Maureen has sought an increase. On April 21, 1982 the trial court denied simultaneous rules to increase or decrease the award and only Maureen appealed from that denial.
CHILD SUPPORT
The $400 per month per child support stipulated in 1978 was continued in the October, 1980 divorce decree. Despite three rules to decrease by James and one rule to increase by Maureen, the $800 per month has not changed.
Maureen claims her expenses for the children have increased and despite James’ alleged meager income, his lifestyle indicates sufficient means to pay $1400 a month. She asserts the trial court gave undue weight to James’ testimony which she says is “replete with egregious contradictions.”
The record shows that during and after the marriage, James derived his principal income from renovation and sale of old buildings. He testified that he owns several pieces of real estate, but mortgage payments and other expenses substantially exceed the rental income. He stated the real estate business is currently “very slow” and he has been unable to sell the properties at a profit. His federal tax returns show only $9,328 income for 1980 and $6,322 for 1981.
James testified he was unemployed and looking for a job in Nashville where he lives with his second wife who is also unemployed and permanently disabled due to a back injury. Maureen disputes James’ financial status, citing his testimony that he honeymooned in Mexico, drives a Jaguar, belongs to a country club, and owns several houses. She also points to over $500,000 which passed through his corporate bank account in one year which he said was borrowed to buy and renovate the properties which are losing money.
James counters that his financial circumstances have worsened, whereas Maureen receives $900 per month from a former community mortgage note, plus the $800 monthly child support. She also owns two unencumbered lots in Mandeville appraised at $60,000, in addition to a condominium from which she has not attempted to secure income. Further, Maureen admitted she and the children are living rent-free in a house owned by her aunt, although she claimed housing expenses of $379.50 per month in her expense sheet.
As in most cases involving support (child or alimony), this record is replete with charges, denials, accusations and contradictory statements with disputed facts and figures. Child support awards are not subject to change absent a change in the circumstances of the parties. Laird v. Laird, 363 So.2d 244 (La.App. 4th Cir.1978). After hearing lengthy, conflicting testimony and reviewing numerous exhibits, the trial judge found Maureen failed to prove her ex-husband’s circumstances had changed sufficiently to warrant an increase in the support award. We all know trial courts are accorded great discretion in child support matters and we find no abuse of that discretion.
COMMUNITY PROPERTY PARTITION
JAMES’ ASSIGNMENTS OF ERROR
A. Award of certain jewelry.
James complains the trial court’s award to Maureen of her diamond engagement ring, platinum wedding band, and two other bracelets was improper. He cites the provision in the partition agreement which *536 awarded to each spouse, as his or her separate property, “all gifts made to either party” by his or her parents or other blood relatives. According to James, the items in question were Wall family heirlooms which should be returned to his mother and grandmother.
Maureen points out that, in addition to the general “gift from family” provision, the agreement contained a more specific clause in which the parties allotted to James “all of the guns, hunting equipment, tools and building materials and [stipulated] that Mrs. Wall will receive all of her personal jewelry.” Maureen relies on the principle that, in contract interpretation, the more specific provision controls the general, citing Mixon v. St. Paul Fire & Marine Ins. Co., 84 So. 790, 147 La. 302 (1920). She argues that, in the partition agreement, the general language regarding gifts is modified and controlled by the clause explicitly allocating the hunting equipment to James and the jewelry to her. Maureen says this interpretation is supported by the evidence that the hunting paraphernalia included guns, a pirogue, camping equipment and building materials of substantial value which were intended to be offset by her retention of the jewelry, which was the only jewelry she owned of any significant value.
Maureen also says that although the diamond in her engagement ring originally belonged to James’ grandmother, she selected the setting and received the ring as an engagement gift from her then-fiancé, not as a gift from her in-Iaws-to be. Similarly, the wedding band may have once belonged to her husband’s grandmother, but it was a gift from her husband at their wedding.
Maureen argues, alternatively, that since the partition agreement purported to divide certain community property, prenuptial gifts such as the engagement ring and the bracelet, which are not community property, are not covered by the document. James makes the interesting argument that the “personal jewelry” provision in the partition agreement refers to community property only, but that the “family gift” clause encompasses premarital gifts also.
The trial judge did not assign reasons, but we find his award is amply supported on either of the grounds raised by Maureen. If the agreement is deemed to encompass premarital, as well as community property, the specific provision allocating her jewelry to Maureen should take precedence over the general “gift” clause, especially where there was evidence the jewelry was not “gifts” to Maureen from her in-laws. Also, the facts and evidence show the parties intended the jewelry allotted to Maureen to be comparable in value to the hunting equipment allotted to James. If the partition agreement does not cover pre-nuptial donations the jewelry should be retained by Maureen, in whose favor the separation was granted. Roy v. Florane, 239 La. 749, 119 So.2d 849 (1960). LSA-C.C. Arts. 156 and 1740.
B. Award of the master bedroom bed.
In the partition agreement it was stipulated that “the balance of the property with the exception of the bed in the master bedroom will be treated as community property .... ” The trial judge awarded the bed to Maureen as her separate property. James contends the bed was excepted from the list of community property because “the parties intended for him to have it.” James asserts he bought the bedposts with money given him by his family, but there is no evidence to substantiate that allegation in the record.
James listed the bed as community property in his sworn descriptive list filed with his petition to partition. Conversely, Maureen did not list the bed as community property in her descriptive list, which was attached to the partition agreement signed by both spouses. According to Maureen, the deliberate omission of the bed from her list and from the community property listed in the partition agreement was because both parties had acknowledged the bed was her separate property. Maureen asserts that although James did not mention the bed in his petition, in her answer and recon-ventional demand the bed was listed as her separate property.
*537 Inexplicably, neither party produced any testimony concerning the bed at any of the hearings. Inasmuch as Maureen’s pleadings, her descriptive list, and the partition agreement are consistent that the bed was her separate property, and James’ descriptive list contravenes his current position, we find no error in allocation of the bed to Maureen.
C. Assessment of Maureen’s attorney’s fees against the community.
Maureen testified she incurred attorney’s fees of $7,500 in connection with the partition action and the court ordered that amount, plus $350 in court costs, to be paid by the community. James contends the award is erroneous, based on language in the partition agreement and the fact that the community had terminated at least six months before the partition contract was signed and over two years before the trial on the partition suit.
The partition agreement provides, somewhat ambiguously:
Appearers further recognize and acknowledge that the community of ac-quets and gains terminated on June 29, 1978 and it is agreed that any debts of appearers incurred after the date of the judgment of separation, cost and/or attorney’s fees of each, incident to the separation proceedings shall be paid by each of the parties hereto individually.
Under a broad reading of this provision, “any debts of appearers incurred after ... [June 29, 1978,]” would include debts for attorney’s fees in connection with the partition proceedings. Maureen argues that the stipulation in the contract refers only to attorney’s fees and court costs in connection with the separation and “is silent with respect to other actions in connection with the divorce.”
We do not believe the parties, after acknowledging the termination of the community and providing that attorney’s fees and costs already incurred in connection with the separation were not to be deemed community obligations, intended that attorney fees to be incurred subsequently in connection with the partition would be community debts. Such an unlikely interpretation would also negate the general clause in the same sentence classifying “any debts incurred after the date of the judgment of separation “as separate debts.” Additionally, Maureen’s interpretation would ignore the fact that the partition proceedings in this case were filed in the separation action and that the separation decree ordered the spouses to make “an expeditious effort to settle the community.” Thus, we find the partition suit was “incident to the separation proceedings” and under the partition agreement the attorney’s fees involved are the separate debts of the respective spouses.
The assessment of Maureen’s attorney’s fees and costs against the community was erroneous and is reversed.
D. Reimbursement to James for community debts allegedly paid from his separate property.
James seeks reimbursement for one-half of various debts which were allegedly incurred prior to the termination of the community, but which he claims were paid with his separate funds after the community’s dissolution. The items included credit card payments, loan repayments, country club bills, utilities, tax payments, etc. No documentation was offered and James merely testified that he incurred the bills before the separation suit was filed.[1] He did not *538 testify that the items were paid with his separate funds and, in view of his meager earnings during this period, it seems more likely the bills were paid from community funds. The trial court’s determination that reimbursement was not substantiated is supported by the record.
E. Award to Maureen of $5000 for payment of joint federal income tax.
Both parties challenge this award which relates to payment of joint federal income taxes for the couple’s 1977 community income. Although the parties were still married at the end of 1977, they had separated physically several months before the 1977 tax return was due. James testified he gave the tax information to his accountant, Mr. Friedrichs, who prepared a joint return and gave it to James in mid-March, 1978.
Despite urgent requests by James, Maureen refused to sign the return. At trial she admitted her refusal to sign, which she based on her distrust of the income information supplied by her husband. Maureen testified that on her attorney’s advice, she refused to sign the return or release community funds in escrow until the community was settled and the tax forms were reviewed. She did not, however, recall asking to see the return or review it with an accountant. Maureen persisted in her refusal to sign the return or disburse joint funds, even after being advised that severe penalties and interest would be accruing. On April 17, 1978, James filed for a hardship extension, but was apprised by the Internal Revenue Service in October, 1978 that the extension had been granted for only two months and that penalties and fines were due.
James made a tax payment of $87,000 in October of 1978 from community funds under his control, but was unable to secure Maureen’s signature to file the joint return until March 19, 1979. At that time, Maureen signed an agreement prepared by her attorney which provided:
In consideration of the agreement made by James T. Wall, III to file joint individual income tax returns for the calendar year 1977, I, Maureen O’Brien Wall, do hereby agree to pay any additional amounts due as interest or penalties attributable to such taxes on joint income earned during calendar year 1977 which may arise as a result of my individually failing to request extensions of time for filing said tax return, or as a result of our failing to file returns and pay income taxes when due.
Maureen contends she was induced to sign the agreement because of James’ misrepresentation to her that he’d obtained an extension, and argues she should not be bound by the agreement. We find no evidence of such a misrepresentation. The accountant corroborated the husband’s testimony that a temporary extension was obtained. There is no mention of reliance by Maureen on any extension in the agreement, which speaks for itself and recites as Maureen’s consideration James’ agreement to file jointly with her. Inasmuch as James had obtained a limited extension to file and had actually paid $37,000 in estimated taxes in October of 1978, while Maureen had refused to cooperate with James in filing a joint return and had taken no steps toward filing a separate return by March of 1979, James’ agreement to file jointly with her constituted substantial and valid consideration and Maureen is bound by her agreement.
A letter from the Internal Revenue Service introduced by Maureen summarized the couple’s 1977 tax data:
Tax per Form 1040 received March 22,1979 . $22,794.00
Estimated tax payment - July 1, 1977. $ 240.00
Payment, October 12,1978 . 37,000.00
Late filing penalty. 5,638.50
Overpayment applied to settle 1975 tax balance. 10.35
Late payment penalty. 338.31
Interest. 663.95
Overpayment applied to Mrs. Wall's estimated tax. 577.06
Overpayment applied to Mr. Wall’s estimated tax. 7,217.83
$37,240.00 $37,240.00
*539 As the letter indicates, the couple overpaid their 1977 taxes by $14,446 but owed penalties and interest totalling $6,640.76. In accordance with the agreement, the penalty and interest charges were deducted entirely from Maureen’s half of the overpayment (which was $7,223), leaving Maureen with a credit of $582.24 ($7223.00-$6640.76 = $582.24). Another $5.18 was subtracted from the credit due Maureen, and $5.17 from the credit due James, to settle a $10.35 balance due on their 1975 taxes. James therefore received a credit of $7217.83 ($7223.00 - $5.17) and Maureen received a credit of $577.06 ($7223.00 - $6640.76-$5.18).
In view of Maureen’s agreement to pay all penalties and interest on the 1977 taxes, we find the I.R.S. properly calculated the credits due to each spouse. The trial judge did not explain the award to Maureen of $5000 for “payment of joint federal income tax.” There is no basis for the award which, we surmise, was based on a misunderstanding of the data and is reversed.
F. Award of $4,000 to James representing half the draw made against the community by Maureen Wall.
This award stems from the trial court’s characterization of support payments to Maureen and the children during the separation as a “draw on community funds.” Neither party is satisfied with the award: James claims the amount owed him should be $8,000; Maureen contends she owes James nothing and he owes her $4,000.
The controversy comes from the judgment of separation which provided in part:
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Maureen O’Brien Wall shall receive for her support and maintenance and that of the two minor children the sum of $2,000.00 per month, retroactive to April 20, 1978, and on the 20th of each month thereafter, from the fund on deposit in the Jackson Homestead, which deposit shall be subject to draw on the joint signatures of Gibson Tucker, Jr. and Dudley D. Flanders; and that James T. Wall, III will have the use of other current community income, subject to his having to account for said income at the time the community is divided, at which time, Maureen O’Brien Wall will also account to the community for any other income she may have received since the separation proceedings commenced;
From the date of the separation until the partition of the community in 12/78, Maureen received approximately $16,000 from the community funds in Jackson Homestead, including about $4,838,24 that was automatically withheld by the Homestead for mortgage payments on the Upperline Street home. Maureen contends under the separation judgment the $2,000 monthly support payments were intended as alimony pendente lite. She argues since the payments were made following the termination of the community, they were the separate obligations of her husband and, since he paid them from community funds, her separate estate is entitled to reimbursement of $8,000. She also claims reimbursement for the funds withheld from her support payments for the home mortgage.
In support of her claim, Maureen cites a later judgment[2] on a Rule for Contempt which refers to the $2,000 monthly support payments as “alimony pendente lite.” Maureen argues that our jurisprudence has never required a wife to repay alimony pendente lite and child support, and that the trial court’s order is “repugnant to the public policy of Louisiana.”
James contends the provisions of the separation judgment regarding support payments were negotiated between the parties who intended to provide that, until the community was settled, Maureen could draw up to $2,000 per month from the Homestead account as an advance on her half of the community. James cites the provisions of the separation judgment ordering the parties to settle the community expeditiously *540 and providing that upon settlement of the community, child support payments of $800 a month only would be due.
There is no language in the separation judgment indicating that the monthly payments are to be deemed either alimony pen-dente lite or an advance on Maureen’s half of the community assets. In view of the provision that her payments were to be made from existing community funds and were to cease upon settlement of the community, (while the divorce action was still pending), we find the payments were not intended as alimony pendente lite payable from the husband’s post-separation earnings. We also find, however, that the parties did not contemplate these disbursements to Maureen as an advance on her portion of the community distribution. Rather, it appears they intended to utilize community funds to fulfill the existing marital obligation of spousal and child support during their post-separation period. Upon final settlement of the community, it was intended that James would begin child support payments and that Maureen’s income from her share of the community assets would be sufficient for her support.
Based on the language of the separation judgment, supra, we find Maureen does not owe reimbursement for the $2,000 monthly payments. There is no mention in the decree of any accounting due by Maureen for her receipt of the $2,000 each month. The separation judgment does provide, however, that James “will have the use of other current community income, subject to his having to account for said income at the time the community is divided, at which time, Maureen O’Brien Wall will also account to the community for any other income she may have received since the separation proceedings commenced . ... ” This language, stipulated by the parties, clearly expresses their intent that Maureen’s receipt of $2,000 a month would not be an advance on her share of the community, but any additional amounts drawn by her would be deemed such an advance.
This understanding of the parties’ intentions is reflected in an agreement executed in September, 1978 in which they stipulated that monthly mortgage payments of $688.34 be paid directly to the Homestead and Maureen would receive $1,550.00 per month under the separation judgment. The agreement provided: “It is stipulated that $238.34 of this amount is an advance to Mrs. Wall directly from her half of the community.” Significantly, $238.34 is the amount by which, with the mortgage payment, Maureen’s receipt exceeded $2,000 a month.
The trial judge apparently believed Maureen’s draw was an advance on her share of the community but miscalculated the amounts drawn by her, thus awarding reimbursement for only ¼ of the $16,000 drawn. Since we find there is no basis for James’ entitlement to reimbursement, the $4,000 award is reversed.
G. Rejection of James’ claim for $903.36 drawn by Maureen from Homestead.
In accord with the September, 1978 agreement described in § F above, Maureen received a total of $1,806.72 over and above the stipulated monthly payments.[3] Although she admits this sum was an advance from her share of the community, she contends the reimbursement of $903.36 that would be due James is “more than offset by the $1,000 which she was required to pay from her separate property to Jackson Homestead.” There is no evidence that Maureen paid $1,000 from her separate funds into the Homestead account. In her brief she asserts she received $2,000 during the separation from “certain community mortgages” and “was required to leave one-half of said mortgage payments ... in Jackson Homestead.” Since Maureen apparently spent her half of the $2,000 community receipts and the other $1,000 was left in the account for later distribution, there is no reason why her debt to James *541 for $903.36 should be offset by $1,000. Therefore, the denial of James’ claim was erroneous and judgment is hereby rendered awarding James $903.36 from Maureen.
H. Refusal to recognize debts owed to James’ parents.
James testified his parents were owed $8,950.36 by the community for loans made by them during the couple’s marriage. He produced no promissory notes or other documentary evidence to substantiate the alleged loans and neither of James’ parents testified. Maureen denied any such indebtedness.
The trial judge properly found the evidence insufficient to support the claim.
MAUREEN’S ASSIGNMENTS OF ERROR
A.$6,000 offset to James.
The community property settlement provides that:
In order to off set [sic] the difference between those assets received by Mrs. Wall and the above assets received by Mr. Wall, Mr. Wall will be entitled to a $6,000.00 adjustment which he may use in having first choice of any furniture or personal property of the community at the price set forth in Mrs. Wall’s descriptive list or he may receive cash in lieu thereof. Mr. Wall will have selected those items he chooses by January 31, 1979. (Emphasis supplied.)
Both James and Maureen testified they understood this would give James the option of choosing $6,000.00 of community furniture or receiving $6,000.00 in cash from community funds. James contends he opted for the cash payment and apprised his wife of his decision shortly after the partition contract was executed.
Maureen, however, contends James did not notify her of his decision to accept the cash until February 1, 1979, one day after the deadline specified in the agreement, and that he still has possession of the majority of the community furniture and other movables. At trial, James admitted he has most of those items either in his possession or in storage. Maureen expressed her willingness to pay James the $6,000, which is now in an escrow account, if he accounted to her for the remainder of the furniture.
The trial court awarded James $6,000 plus interest from June 29, 1978. While Maureen argues the amount should be offset by the value of the furniture in his possession, we find no provision in the partition agreement disposing of the furniture. The parties specifically acknowledged that the partition agreement divided only some of the community assets and reserved their rights to a judicial partition of the remaining community assets if an amicable settlement could not be reached. Neither party has petitioned for partition of this furniture and therefore James is not at fault in maintaining custody of these assets and his entitlement to the $6,000 is not contingent on the tender or partition of community movables not covered by the partition agreement. The award of $6,000 is affirmed.
B. Obligations to Maureen’s father.
From December, 1977 through April 20, 1978, a period which began after Maureen left the family home and ended when Maureen began receiving court-ordered support payments retroactive to April 29, 1978, Maureen received money from her father which she allegedly spent for “necessities” for herself and the children.
Although Maureen introduced checks to-talling $3,453.00 drawn by her father, there was no evidence as to the nature of the payments, i.e., loans or gifts. The record shows Maureen’s father gave his daughter large sums of money throughout her marriage, with no apparent expectation of repayment. We find no error in the refusal to recognize the payments as community obligations.
C. Denial of income from notes and rents as community property.
One of Maureen’s most substantial claims is for half of the income James received from community immovables prior to *542 the partition agreement. Maureen cites the provision in the separation judgment which allowed James the use of current community income “subject to his having to account for said income at the time the community is divided.” (Our emphasis).
Maureen introduced a ledger showing the amounts received by James and herself from December, 1977 through December 19, 1978. However, the petition for separation was not filed until February 21, 1978[4] and any accounting owed by James would not include income received before that date. James does not dispute the amounts he received during the post-separation period but contends these amounts, totalling approximately $16,000, should be offset by Maureen’s receipts of approximately the same sum for the eight months she received a $2,000 draw. As we determined previously, however, those receipts by Maureen were not subject to an accounting, as they were intended to be in lieu of child support and alimony pendente lite.
James admits he “received approximately $16,000 over the period,” but does not claim this money was used to pay community debts. Since his only defense to Maureen’s demand for an accounting is that she spent an approximately equal sum for support during this period, we find Maureen’s claim has merit and was improperly denied or passed over by the trial court. The judgment is therefore amended to award Maureen $8,000 from the community.
D.$244.36 payment on mortgage note.
Pursuant to the Act of Partition, Maureen was awarded as separate property a promissory mortgage note on a house in Brooklyn, New York which the couple had sold. On December 20,1978 James received $244.36 on the note even though the payment was the property of Maureen by terms of the settlement.
Although evidence of James’ receipt and negotiation of this check was presented at trial and not contradicted, the trial court did not address the claim. The judgment is therefore amended to provide $244.36 to Maureen from James’ separate property.
E. Division of Silver Stack stock.
Maureen contends the descriptive list filed with the partition agreement lists 1000 shares of Silver Stack stock and she is entitled to receive 500 shares. James responds that as is evidenced by Maureen’s reconven-tional demand she “is perfectly aware that the stock was sold before the termination of the community or its partition.” James avers the stock was sold pursuant to Maureen’s order, while Maureen argues James converted and sold the stock in violation of a restraining order.
No evidence was adduced at trial. In his brief James admits he received $1,200 from the sale of the stock (a check for that amount was mailed to the family home while he was living there) and is willing to reimburse the community for that amount. Therefore, the trial court’s judgment is amended to award Maureen $500 for this item.
F. The French brocade sofa.
Maureen contends the trial court erred in awarding this item to James in the absence of any testimony concerning the condition or ownership of the sofa. We note the sofa was listed as community property on both descriptive lists but was not allocated to either party in the partition agreement. Neither party sought ownership of the sofa in the pleadings or at trial. The only reference to the sofa in this suit was a claim in James’ petition for $2,500 for damages to the sofa and other items left in the Upperline house while Maureen and the children lived there. The trial judge rejected that claim for damages, finding the damage to the property was not more than the usual “wear and tear.”
*543 Award of the sofa to James was clearly an error as this item is part of the undivided community property subject to future partition.
MOTION TO REMAND
Mr. Wall filed a motion to remand this appeal because a portion of recorded testimony was lost. The missing testimony relates to visitation rights which have not been appealed. The motion is denied.
As specified above, the judgment of the district court is partially amended, reversed and affirmed.
AMENDED IN PART; REVERSED IN PART; AFFIRMED IN PART.

. Maureen argues the community terminated retroactively to 12/29/77 when the first separation petition was filed, but the first petition in the record has a 1978 docket number and was not filed until February 21, 1978. Under Art. 155, the termination of the community is retroactive to the date the petition was filed “in the action in which the judgment was rendered.” Since the separation judgment was rendered in this action, any earlier petition for separation in another suit would not affect the date of termination of the community.
In their partition agreement the parties acknowledged that “the community of acquets and gains terminated on June 29, 1978” [the date of the separation judgment]. Since the community had already terminated by operation of law on February 21, 1978, this stipulation has no effect.

. The separation/support judgment was rendered by Judge Federoff, but the later support rules and the- partition suit were tried before Judge Roberts.

. This figure represents a draw of $238.34 times eight months, less $100 due to an arithmetic error.

. The briefs refer to some pleadings purportedly filed in December, 1977, but no such petition or injunction appears in the record.